The Zillow Group is a joint venture with the Zillow Group, Inc.  Okay, this is the time set for argument in Case 24-685, Real Estate Exchange v. Zillow. I think our courtroom deputy, Mr. Price, has let the parties know we'll hear first from the appellant, and then we'll hear from the Department of Justice, followed by the two appellees, and then we'll hear a rebuttal from Ms. Rengaro. Ms. Rengaro, good morning. Good morning. So my name is Ursula Rengaro. I'm with Boies Schiller Flexner, and I'm here with two of my partners, and we represent Rex Realty Exchange. My plan, which may be a little ambitious, is to address four significant issues from the judge's summary judgment order and then separately address what we contend is the error in the WCPA instructions. The four errors that I intend to address, if I have time, are that the agreement that we alleged, proved, and argued at summary judgment was the agreement between NAR and Zillow to segregate listings, not to conceal, segregate, and demote, that the segregation rule is direct evidence of an actionable agreement between NAR and Zillow, that the segregation rule is direct evidence of concerted action despite the optional label, and that the evidence showed that Zillow's agreement to adhere to the segregation rule was not made independently of the National Association of Realtors, which I am calling NAR. So let me turn first to the issue of segregate, conceal, and demote. As we explain at pages 17 through 21 of our reply brief, conceal and demote was not part of the agreement we alleged, and it also is not what we sought to prove or what the parties argued at summary judgment. The phrase segregate, conceal, and demote appears in one paragraph out of 260 paragraphs of the amended complaint. Everywhere else, conceal or demote is used to describe the effect of the segregation or is relevant to Rex's Lanham Act claim or WCPA claim. Most telling is the briefing on the summary judgment motion. We never argued an agreement to segregate, conceal, or demote. And the transcript of the summary judgment hearing itself reflects that none of the parties argued segregate, conceal, and demote. And even the counts of the complaint reflect, the antitrust counts do not reflect an agreement of segregate, conceal, and demote. And that makes sense because the restraint that we're challenging is the restraint imposed by the segregation rule, which is the requirement that listings be segregated and no more. That's the starting point. That's where the meeting of the minds occurs. Can I ask you about that, though? I mean, it would seem that what's most problematic for your clients was the website layout and design, but I see you saying no. So that is the question I have, is that when the district court characterized the problem that your clients had with this, it seems that the problem was more specifically with the website, which is really an effort to implement the rule and is not necessarily the rule itself. So obviously our claim is a Sherman Act Section 1 claim, and we're talking about an agreement and restraint of trade. And our position consistently was that the agreement and restraint of trade was the agreement to segregate. And yes, the website is the implementation of the rule, but under this court's decision in Plymouth Dealers Association of Northern California, the starting point is the restraint. What happens beyond that is implementation and should be of no consequence. Could the segregation have been done in a way that was favorable to Rex? I think only in the most theoretical of ways, and I think that the antitrust jurisprudence says we need to look at the practical economic realities here. And as I intended to discuss further on in my argument, the MLS listings are far less numerous and less remunerative for brokers and agents than the MLS listings. And the natural tendency of the separation, to use a phrase from Eastern State Lumber Dealers Association, is that the MLS listings are going to get more prominent treatment than the non-MLS listings. And in fact, the proof is sort of in the pudding in what happened with Zillow. Zillow tells you that they spent an enormous amount of effort trying to accommodate the rule and get all the listings easily accessible to its users, yet the non-MLS listings still ended up nearly invisible. Counsel, was Zillow required to consider and protect Rex's interest in its website display when it decided to change it to comply with the no commingling rule? Well, Zillow, had it not combined with the National Association of Realtors, could have taken any position that it wanted to as to Rex. The problem is that Zillow combined with NAR in an anti-competitive scheme. So how – I want you to explain that to me a little bit more in depth, because the record shows that Zillow tried to lobby NAR, correct, to allow commingling. So how are they now scheming together? Well, the reason that Zillow – Zillow will tell you the reason that they joined NAR was because they had made a decision to seek listings data through IDX feeds. They had no choice but to join NAR, because otherwise IDX feeds would not have been available. So they didn't like the rule, and as you point out, after they implemented it, they went to NAR to see that it be changed. But the fact that they reluctantly joined NAR in order to obtain the IDX feed should have no impact on the court's assessment of whether or not there was a Section 1 agreement, if I've answered your question. Thank you. Where was the agreement between NAR and Zillow to design the website in the way that it did? Well, there was an agreement between NAR and Zillow to segregate. How Zillow decided to segregate was entirely up to Zillow. But the segregation is what is inimical. But isn't how Zillow did this what's really causing the problem for your clients? I cannot agree with you about that. I didn't think you would, but I want to know why. No, of course. Our position is that it's the segregation that creates the problem, and what follows from the segregation is mere implementation. And, again, in the words of Plymouth Dealers Association, of no consequence. Counsel, in your view, how could Zillow have changed its business model to get the IDX data and avoid antitrust liability? What could it have done? Well, I don't know. I haven't really given that a lot of thought. But the fact of the matter is that in order to get the IDX data, they had to join the anti-competitive scheme. There is nothing else they could have done under the circumstances. If they were going to pursue IDX data, they had to do this. So one question that we haven't touched on yet is whether the rule is optional or not, and does this matter. And so why don't you tell us where you are on that. Our position on the optional label that NAR attached to the rule is that it's a red herring. The real issue is concerted action. And for over a century, the United States Supreme Court has looked past optional labels at the practical reality of what it is that's going on in the trade association. So I would point you to, for instance, the case of American Column and Lumber from 1921, in which the Supreme Court examined a plan that was labeled optional by the late Lumber Dealers Association. It was labeled expressly optional. And the Supreme Court found that participation in the plan was concerted action. In fact, they went so far as to call out the Lumber Association for the misleading misnomer. Do you say that every optional rule is concerted action, or do you think you have to look at the evidence and the record and determine whether in practice it was something more than just optional? I think you have to look at the rule and see how it operates. In American Column and Lumber, it was an optional plan that involved a very extensive exchange of information that was then used to set prices. And the determination by the Supreme Court did not rely on evidence. It relied on examining the rule. Or the plan, rather. It wasn't a rule. It was a plan. I mean, the rule on its face says it's optional, so would you not need to be looking at more of the implementation or how it works in practice to be able to assess whether this is concerted action? Well, it's only optional for the MLSs. And also, by the way, NAR provided in the manual where the rule appears for the adoption by the MLSs that the rule could not be modified by the MLSs if they adopted it. And it required that the MLSs impose the rule on the MLS participants who are like the subscribers in the MLS. And so it's optional at one level. At the next level, it's not optional. It's mandatory. If the MLS adopts it, they have to impose it on the participants. If the participants violate the rule, then they're subject to sanctions. And importantly, for Zillow's purposes, one of the sanctions would have been potentially the loss of the IDX fees. I mean, one question then one would raise is there is clearly some requirement at some level, but where is this being done between NAR and Zillow? So you're asking me about the fact that the MLSs are imposed in between?  Right, which starts to lead us into the question of is there a theory against the MLSs, which I want to hear your view on, too. Well, I think there is a theory against the MLSs, just as there's a theory against NAR. So let's talk about the fact that—what is it that NAR and the MLSs are? So what they are is they are instrumentalities of members of the National Association of Realtors who are brokers and agents who compete against each other for listings and commissions, but use the National Association of Realtors to coordinate their activities and legislate the terms on which competition can occur by promulgating rules that are then deployed to the MLSs for adoption, implementation, and enforcement. So under American Needle and under AP, NAR and the MLSs are liable. Now, we didn't name the MLSs, but under conspiracy law, we don't have to name every potential conspirator. We named the ones that we wish to focus on, which were NAR and Zillow. And just to add a finer point to it, our position is, of course, that the MLSs are instrumentalities of NAR as well as instrumentalities of the membership. And we believe that to be totally consistent with American Needle. I guess the question I have looking at this is, when you have an optional rule like this that's put out by a trade association, what kind of record evidence does one need to make that rule seem non-optional or more concerted in practice? And maybe I'm thinking about it the wrong way, but that's a question I have hearing this presentation. So the concerted action at the rule level is the concerted action of the members of the National Association of Realtors to cause the promulgation of the rule. Where does Zillow come in? Zillow comes in at a different step when it agrees to adhere to the rule. Does that answer your question? Well, it sort of restates the issue because here we have 71 percent of – and so I look at that number and I ask, you know, it could be higher, it could be lower. What do we draw from that? But the significance of that is only that it determines the scope of the conspiracy. So our conspirators are NAR and the MLSs that adopted the rule. We're not including the MLSs that didn't adopt the rule. So that's the significance of the 71 percent. There's no legal significance to the fact that some adopted it and some didn't because, like I said, the fundamental issue is concerted action. And there was obviously concerted action with respect to the members of NAR and the members of the MLSs that adopted the rule. So I would like to – if I could, I'd like to move on to something else which perhaps is of concern to you, which is the issue of whether or not the segregation rule is on its face an anti-competitive restraint. And we have two reasons that we believe that it is. The first is that where it is adopted, it requires MLS participants like Zillow to display non-MLS listings separately from – I'm sorry, non-MLS listings from non-NAR sources separately from MLS listings. And by doing that, it constrains conduct in commerce and it deprives the marketplace, using the language of American Needle, of entrepreneurial diversity and actual or potential competition. The other reason it's a facial restraint is, again, using the phrase from the Eastern State Lumbers case, its natural tendency is to disadvantage non-MLS listings by making them less visible. And again, the proof of that is what happened with Zillow. Zillow tried to accommodate both the rule and its interest in making the listings visible to the users, and the listings still ended up invisible. All right. Now, if I could, I'd like to turn to this issue of whether or not there was direct evidence, because that is a very important issue in this case. If there was direct evidence of a Section 1 agreement, then Matsushita and NRA Citric Acid don't apply, and Rex had no burden to rebut Zillow's business justification for its pursuit of IDX feeds and its implementation of the segregation rule. There's direct evidence in this case because there's a rule that's anti-competitive on its face that Zillow agreed to adhere to. It's as simple as that. But there is more. Using the language from the NARAB decision, we know indisputably that NAR is the architect of the rule. In addition, NAR is also the ringleader of the scheme created by the rule. And I say that because it proposed its adoption by the affiliated MLSs. It dictated where adopted. It could not be modified. It dictated that the adopting MLSs impose the rule on their participants such as Zillow, and it proposed a range of sanctions for noncompliance, which in our view explains why Zillow went to NAR and not to the MLSs to seek the replacement of the rule with a mandatory commingling rule. Now, turning to Zillow's, I think I should turn to Zillow's independence because we've covered the optional label. Again, the judge concluded that Rex failed to produce evidence that Zillow did not act independently in redesigning its website. That would be Rex's burden under Matsushita and In re Citric Acid if the record did not contain direct evidence of concerted action. But as I've already explained, it does. The relevant issue should be whether Zillow's participation in the scheme. I'm sorry. The relevant issue as to Zillow's participation in the scheme is whether Zillow would have redesigned its websites but for NAR's segregation rule. And we review the evidence in detail at pages 33 through 36 of our opening brief and five through six of our reply brief with extensive citations to the record, which in our view catalogs the evidence which is conclusive that Zillow redesigned its websites because adhering to the segregation rule was the only way it could get IDX listings data. And the but for makes this the antithesis of independence. In fact, not even Zillow will tell you that it decided on its own to segregate listings. It segregated because it was the only way that it could get the IDX data. Zillow also tells you that in its brief, it tells you that it redesigned its websites to conform to NAR's rules governing access and display of IDX data. That's pages 11 and 13 of their briefs. So these facts don't require any inference at all to demonstrate that Zillow agreed to enforce the rule. What you seem to be saying is that just Zillow's compliance with what is on its face an optional rule is sufficient to create an agreement between Zillow and NAR? Well, I'm not sure if you're referring to the Toscano case, but if you are, we think Toscano is significantly different than this case. Zillow was not a passive party that simply acquiesced to non-negotiable terms and conditions as occurred in the Toscano case. Zillow altered, fundamentally altered the way it had been doing business for 15 years in order to accommodate the segregation rule. And unlike the local golf associations in Toscano that deferred to the National Association for Eligibility Criteria and to set the slates for the competition and for the slates of the competitors and the individual tournaments, Zillow, as it tells you, made an enormous effort to accommodate this rule. And then built into its system a mechanism to enforce it, to ensure that non-MLS listings would not end up in the MLS category. So again, our position is N-ray citric acid and Matsushita are inapplicable here because the case is really based on direct evidence and the direct evidence is obvious. It is the smoking gun evidence. The smoking gun evidence is the rule and the fact that indisputably Zillow agreed to adhere to it. I would also, maybe I should point out that- We've taken you a little bit over your time. I want to know, do you want to maybe reserve time for rebuttal? Yes, I do and I meant to say so. Okay. Why don't we put three minutes on the clock for rebuttal and we'll see you in a few. Thank you. May it please the court, Alice Wang on behalf of the United States. We're here today to protect the legal framework for concerted action. Concerted action is the threshold requirement in a Section 1 claim. In American Needle, the Supreme Court said that concerted action had to be defined broadly as encompassing any arrangement that joins together independent centers of economic decision making. Now, in the context of trade associations, there are three different ways at least that an optional rule can support concerted action. Importantly, we don't read NAR and Zillow as disputing the viability of any of these theories. First, an optional rule could be mandatory in practice. Second, the adoption of an optional rule can itself be concerted action. And third, an optional rule can serve as an invitation for others to join in a common plan. The district court here considered the first theory. It found that the no commingling rule was in fact optional for the MLSs to adopt, but it didn't look at the second or third theories. And its opinion could be read to foreclose these other viable theories of what concerted action can encompass. While we don't have access to the full record, we understand that Rex alleged a scheme to segregate and thereby conceal listings that come from sources other than these NAR affiliated MLSs. There are aspects of that scheme that evoke the third theory, which involves an invitation that's followed by action showing acceptance. So first, the invitation. As the district court found, NAR created and adopted the no commingling rule, and it published the handbook, the rule in its handbook for the MLSs to adopt. There was also evidence in the record that the relevant provisions of the handbook prohibited MLSs that adopted the rule from making any modifications, such that all members would adopt the same rule if they chose to do so. And then we have action showing acceptance. The district court found that a majority of MLSs accepted that invitation and chose to adopt the no commingling rule. And then they required their members, like Zillow, to implement and follow the no commingling rule. I'm not sure the district court really would take issue with anything that you just laid out. It seemed that the district court was more troubled by the lack of involvement between NAR and Zillow on just exactly how Zillow implemented the rule. And it viewed the complaint as challenging the implementation of the rule and not solely the rule. It's the segregation rule itself. As to the implementation, Your Honor, that is like Plymouth Dealers Association, where there's an agreement to segregate. And, you know, the means of implementation of how exactly that segregation would occur was within Zillow's control, but that doesn't mean that there wasn't concerted action on the first point of whether there was a plan to segregate. So we don't see that, you know, the fact that Zillow retained some discretion over the method of implementation as being dispositive on the question of concerted action. What do you think the district court should have done differently? So, you know, the analysis isn't completely clear. We read the district court's analysis as essentially stopping after theory one. It said, okay, I've determined that the MLSs weren't forced to adopt the rule, that it was, in fact, truly optional for them to adopt the rule, and it didn't consider anything beyond that. And so we're concerned about a broad reading of the district court's opinion that there's only one path for an optional rule to become concerted action. So that's why we would ask the court to vacate and remand for the district court to consider these other possible theories, specifically the third theory. And if I may briefly go to Toscano, which your honors discussed with counsel for Rex. Toscano we read as being a case about membership liability. The appellate decision is a little bit less than clear, but read in the context of a district court opinion, it seems like that case is really considering whether the local sponsors could be a part of the concerted action. The summary judgment was only addressed to that, the local sponsors and the title sponsors in that case. We think a more apt example is this court's decision in Epic v. Apple. In Epic v. Apple, the court was clearly considering the question of concerted action, and it said that even if there is a contract of adhesion that one of the parties had no opportunity to negotiate, that that was sufficient to form concerted action. The district court did walk through what it regarded as key evidentiary issues here, that there was no consequence if an MLS decided not to adopt the rule, that the lack of enforcement mechanisms, lack of monitoring, the 71%. So was that not sufficient analysis in your view in terms of what the district court was supposed to do? No, Your Honor. It's a relevant factor, but we don't think it's dispositive as to concerted action. It's certainly relevant under Theory 1, because if there's no enforcement mechanism, that probably suggests that the rule is truly optional. But under Theory 3, for example, there doesn't need to be an enforcement mechanism in order for there to be an invitation to a common plan that's subsequently adopted. It's not just different ways of saying kind of the same thing? The different theories, Your Honor. Well, yeah, I mean, some of these points we're talking about, it seems that we could restyle them in the way that you're discussing, and much of what the district court said could slot into that too. I'm not sure that's the case. As I read the district court's opinion, I don't see where the district court analyzed anything past whether the rule was truly optional. There were four cases that REC cited below, and it seemed to me that the only analysis that the district court offered to distinguish those cases was that those cases involved optional rules instead of mandatory rules, and that was the end of the analysis. So I don't see any consideration of the third theory of invitation and acceptance. I see I'm out of time. So we would ask that the court vacate and remand the case for the district court to consider the evidence based on the correct legal framework. Thank you very much. Thank you. Mr. Michel, good morning. Good morning, Your Honor. Thank you, Judge Bress, and may it please the court, on behalf of the Apelli National Association of Realtors, or NAR. The district court carefully considered a detailed summary judgment record and correctly held that REC's failed to present sufficient evidence of its Section 1 conspiracy claim against NAR. That decision reflects a straightforward, common-sense application of settled Section 1 precedents, and this court should affirm. At its core, REC's claim stems from Zillow's redesign of its website, but under Section 1, there must be an agreement, a meeting of the minds between multiple parties, to restrain trade. The principal argument that REC's advances here is that the optional model rule adopted by NAR was the source of an agreement with Zillow, but as the district court correctly found, that argument fails for multiple reasons. First and foremost, NAR's optional model rule is not an agreement with anyone to do anything. It is fully optional. To the extent that Zillow was required to not commingle its listings, that is because of the intervening decisions of the distinct MLSs, as I think Judge Bress indicated in one of his questions at the opening. And in any event, it's probative that REC's decided to adopt a browser modification nationwide after, as I think Judge D'Alba suggested, considering the pros and cons of that decision, including in the jurisdictions, which amount to 29% of all MLSs, that's dozens or perhaps hundreds of MLSs, that have not adopted the no commingling rule. So for all three of those reasons, any one of which would be sufficient, there was independent action by Zillow that defeats that agreement. Separately, and as another alternative basis on which this court could affirm, the claim that REC's pled, including in page 60 of its complaint, was not merely an agreement to separate, but an agreement to separate, conceal, and demote. Now I know my colleague for REC's has a somewhat different view of the allegations today, but those are the allegations in the complaint, and they're in the complaint for a good reason, because simply segregating listings would not cause any harm to REC's. Businesses, of course, segregate or separate products all of the time without any implication that the separation would diminish or demote one of them. In fact, as I think Judge Bresch suggested, it's entirely possible that Zillow could have separated the listings in a way that was favorable to REC. So separation alone simply can't be enough. And in any event, to the degree there was any harm caused by the separation, it was again Zillow's independent choice on how to design its browser that resulted in that harm, not any agreement between Zillow and NAR. I mean it seems maybe the suggestion is that once Zillow's in a world in which it has to comply with a no commingling rule as a condition of getting the IDX feeds, that just inevitably given the number of agent listings versus people like REC's, there's going to be some concealment or demotion, however you want to characterize it. It could never really be equal. Well, a couple of responses. First, I think this only goes to sort of the second of the arguments that I was discussing. I think your question started with to the extent that REC was required to comply with a no commingling rule. Now it's critical that REC was only required to comply with a no commingling rule if an MLS, not NAR, an intervening MLS, which is a distinct entity as the district court's opinion at page 25, note 5, recognizes, decided to adopt the no commingling rule. So I think that is a sufficient basis to not even reach that question. But to the extent that you did reach that question, the district court carefully analyzed the evidence that REC's presented and determined that it hadn't presented evidence that there was demotion and concealment in addition to segregation. I actually think it's telling that much of REC's theory is about trying to prefer NAR MLS's. But it's telling that in some MLS's, which are not affiliated with NAR, and there are some out in the world, they've also adopted the no commingling rule. They've decided on their own that that's a valuable policy for them to have for reasons that NAR considered in the first instance. We're ensuring quality and reliability of listings. So this theory that the no commingling rule inherently demotes or favors NAR is belied by the fact that non-NAR MLS's have actually adopted that rule. The last point I'd make, and I don't want to- I want to ask you on the optionality of a trade association rule. In your view, when is that going to cross the line? I take it your position is going to be just an optional rule standing alone is not enough. I assume that's your view. So I think in almost all cases an optional rule truly standing alone will not be enough. I don't think the court needs to announce a categorical rule that that's always the case. And I think my colleague from the governor and I have quite a bit in common. We're not asking the court to announce such a categorical rule. Judge Zille, I don't think, purported to announce such a categorical rule. Read fairly his opinion, considered all of the evidence that was presented, and only got to the optionality of the rule after he had separately discussed the arguments for direct and circumstantial evidence that Rex had presented. I think this court's decision, the Tuolumne case, though, is particularly probative on that case. That was a case in which there was a claim that a hospital board that had adopted the recommendations of the medical providers was engaged in a Section 1 agreement with the medical providers. And this court said no, because the recommendation was truly optional and the board made a separate decision, there's not a Section 1 agreement, even though in that case the recommendation was adopted in every single one of the cases. Is your position any different if here we have 71%? What if it had 99.9%? So I think Rex would have a stronger case if it was 99.9%. I'd hasten to say some of the other arguments that I've mentioned would still mean that there would not be a Section 1 agreement in that case. But I think it's telling that there is nothing like that in this case. Not only is it only 71% adoption, but some of the largest MLSs, including the California Regional MLS, the largest in the country, has not adopted it. Not only does NAR not- Why have they not adopted it, do you know? I'm not sure they've elucidated the exact reasons, but I think they have decided that for their market it's better to allow commingling, which they're, again, perfectly able to do. They remain the largest MLS in the country with no consequences from NAR, and not only does NAR not impose consequences, we don't even track which MLSs are doing that, and we didn't even know until this litigation what the 71% figure was. We only learned that in response to Rex's discovery request. So this is really the polar opposite end of the spectrum from the kind of cases like Goldfarb and other cases in which the Supreme Court or other courts have said that a rule that's optional on its face is actually mandatory and evidence of an agreement in practice. Would you address the government's third theory, which is the invitation to join line of cases? I think Interstate Circuit's probably the primary case. Yeah, so I think Interstate Circuit is not a case that- Well, first of all, it's not a case that Rex particularly relied on in this case. Understood. I think ultimately, and I think Judge Bress said something like this earlier, Interstate Circuit just speaks to another way to demonstrate an agreement, and we agree that circumstantial evidence can be a basis for discerning an agreement. There was very strong circumstantial evidence. After all, the film exhibitors sent a letter to eight distributors and said, the Supreme Court called them demands and said, I expect all of these to be adopted at once. They were proposing a radical change in the market, a price-fixing scheme, the paradigmatic antitrust violation. I think the government has a certain taxonomy, and I don't have a strong view one way or the other whether it's right. I think there are different ways to think about it, but the Interstate Circuit invitation theory is a very poor fit for this case, and that's why Rex, I think, to its credit, hasn't really advanced that theory. After all, there was no invitation in this case from NAR to Zillow, nothing like the invitation in the Interstate Circuit case from the film exhibitor to the film distributor. Also, critically, the distributors in the Interstate Circuit case were competitors with each other, and they had a reason to uniformly accept the exhibitor's request or the exhibitor's demand. In this case, the MLSs, critically, are not competitors with each other. They are operating in separate markets, and so there's none of the background principles that led the court to infer cooperation or conspiracy in the Interstate Circuit case are present here. I think the Supreme Court's decision in Theater Enterprises is helpful. It came about 15 years later in the same industry, the movie industry, and I think clarified that some of the broad language in Interstate Circuit should not be overread. It said, I think, we're not going to eviscerate the conspiracy requirement from Section 1, and I think that sound logic that the Supreme Court has continued to rely on, including in the American Needle case that my friend mentioned, Justice Stevens's opinion for the court points out that the agreement requirement plays an important role because, after all, the standard for Section 1, unreasonable restraint of trade, is much lower than the standard for Section 2, monopolization, and to allow unilateral action to be a subject of a Section 1 claim in the way that it is a Section 2 claim would be to deviate from an important distinction that Congress made in Section 1. I think also, just to go back to the question Judge Bress asked about optional rules, maple flooring, and a long series of cases, including many from this court, honey bums, citric acid, musical instruments, have all talked about the premise that trade associations do not become walking conspiracies simply because they adopt rules or recommendations that their members have the option to follow. In fact, there can be pro-competitive benefits of trade associations sharing valuable information. We would not want an antitrust law that discourages people sharing expertise with each other. The court has no further questions. We'd ask to affirm. Thank you. Good morning, Your Honor. May it please the Court. Steve Engel for Zillow. This case is about how Zillow sought to improve its consumer listings by redesigning its own website. Rex objected to how Zillow chose to display Rex's listings for free and filed an antitrust lawsuit. 580,000 documents later, two dozen depositions, the district court correctly granted summary judgment on the record because Rex had established no evidence of an agreement between NAR and Zillow to boycott, demote, conceal Rex's listings. Now, Rex, this morning, tries to shift from the theory that it relied upon before the district court, stating that the sole thing it cared about was the uncontested fact that in order for Zillow to obtain the IDX listings, it had to enter into subscription agreements, which included licensing restrictions that required separation, and therefore that caused Zillow to redesign its website. But that was not the theory under which Rex brought its case in the first instance. And I could cite a litany of statements of Rex's about this, but I'll just start with the very first sentence of Rex's opposition to Zillow's motion for summary judgment states, in January 2021, Zillow agreed with NAR to segregate and demote the listings of non-NAR affiliated brokers such as Rex. And that's at page 27 of the further excerpts of record. We can go to the first amendment, the operative complaint. Rex's complaint, the first count in which they allege an antitrust conspiracy, they say defendant NAR and Zillow with non-party MLSs entered into a horizontal combination, et cetera, to boycott and deprive non-MLS, non-NAR members, including Rex, effective access to prominent Zillow residential real estate aggregator websites. I guess their position is the only reason they did all these things is because they agreed to abide by the no commingling rule. So the key factual issue, the key issue on summary judgment, was what was the scope of the agreement. They were alleging a group boycott, and there was just no evidence of an agreement between NAR and between Zillow with respect to this boycott. In fact, what all the evidence showed was that Zillow had considerable discretion in how it was to implement the no commingling rules in the jurisdictions that applied. Zillow could have adopted a no commingling rule in the jurisdictions that said no commingling, the 70% of them, a different commingling rule in the other 30%. It could have dropped Rex entirely. Again, Zillow was listing Rex's listings for free. There was no contractual obligation to carry Rex's listings. Zillow wanted to carry Rex's listings. Zillow wanted to promote all the listings. Zillow entered into these IDX agreements because it was concerned about the quality and the completeness and the timeliness and the security of its existing listings. It wanted to expand them. Many other aggregator websites, like major competitors like Redfin, they never carried Rex's listings. Rex's was .05% of the national market. Zillow wanted to make those listings available to consumers. It wanted to keep making those listings available to consumers. It not only came up with, on its own, independently, which is a relevant question for antitrust purposes, this two-tab display, but when its early studies showed that there was a problem with the contrast, it increased the contrast. It adopted an FAQ. It adopted pop-ups to sort of try to drive consumer traffic to tab 2 also, and it did all these things because it wanted consumers to have access to everyone's websites. In fact, it also came up with an idea that Rex could – it came up with a workaround of the IDXs that Rex could have come to Zillow, paid a dollar a listing, and wound up on tab 1. Before Zillow was able to present this to Rex, Rex sued, and so here we are. At the end of the day, Rex pled a weak antitrust case. It went to full discovery, and the district court found that there was simply no agreement because Zillow bent over backwards, frankly. Its principal goal was to help consumers, but it also wanted to keep all the listings on its website, and so there was no conspiracy to boycott Rex, no effort to harm Rex. What does one make of some of the internal documents about concerns within Zillow about whether the no commingling rule would be anti-competitive? It's clear that the no commingling rule is not the favorite rule that Zillow has to comply with, and in fact, Zillow's need to comply with the no commingling rule as a licensing condition for certain IDX feeds was something that cost Zillow a lot of money and that required Zillow to think about how it was going to, in the most consumer-friendly way, redesign its website. I think it demonstrates that Zillow had no conscious commitment to a common conspiracy, and so Zillow is very much like the golf sponsors in Toscano who the price of running a PGA tour, and these guys were not passive operators. These guys were operating the tour. They were picking the golf club. They were bringing in the volunteers, and they were running. They were setting the rules for the tour. The price of doing so was that they had to agree with the PGA's rules, just like the price of getting these IDX feeds. As Judge DeLava mentioned, the only way to get these feeds was to comply with the licensing conditions, and so Zillow's discomfort with the no commingling rule demonstrates that it wasn't part of any kind of scheme and was actually seeking to minimize what it thought were the costs to Zillow and the costs to consumers that would come from it. What's your response to the United States'— the way they've kind of arranged the theories and their focus on the third one? Honestly, I don't know why the United States is here, but it seems to me that their third theory tracks this notion of a conscious commitment to a common plan. I mean, the no commingling rule— the reason why the district court thought the optionality of the no commingling rule was relevant was because Rex argued a direct conspiracy in an agreement between NAR and Zillow, and it's certainly relevant in deciding whether NAR and Zillow, which have no agreements between the two of them— it's certainly relevant to think that all NAR apparently has done is propose an optional rule 20 years ago that some others have followed, and so it was a relevant factor in this, but the bottom line is that there was just no agreement to boycott Rex and certainly no agreement between NAR and Zillow, and so the government says, well, gee, you know, maybe the district court could have thought about option three a little bit better, but again, I think it's within the record, and the district court understood that optionality was not dispositive. It was one factor, and the key fact was that the record did not show an agreement to boycott, demote, conceal Rex's listings, and that was why— and the district court's opinion is replete with this, and the government doesn't have access to the summary judgment record, so the idea that if only the district court, after full discovery, had kind of written his opinion a little bit clearer, then maybe you should go back and have him do it again. This is not a vacate and remand idea, it seems to me. It seems like to the extent the government wants to say this court should not hold optional rules can never be antitrust conspiracies, that's fine, but I don't think that's the position of NAR, and it's certainly not the position of Zillow here, and it wasn't what the district court said below. What about the question of whether the alleged conspiracy encompasses the MLS's, individual MLS's? So I think as we saw this afternoon, the issue of the non-party MLS's has always been they as proxies for NAR. They were the stalking horses for NAR. They're the members of NAR. They are carrying it out. There's nothing in the record that identifies particular MLS's. None of them were ever sued, and in particular, Rex chose to bring an antitrust conspiracy that alleged a nationwide antitrust conspiracy. NAR and Zillow on a nationwide basis were seeking to push Rex out. To the extent they wanted to have localized conspiracies, because all of these MLS's operate in particular geographic locations, it behooves them in the summary judgment record to identify the particular MLS's, the particular markets, to establish that Rex even has listings in those markets. Rex never operated nationally. And so this was, from start to finish, a nationwide conspiracy, which is why they only named NAR and Zillow. And the MLS's were always sort of like non-party agents or proxies and the like. And so the district court corrected, you know, if I could go back to page 37 of the further, 27 of the further excerpts of the record, their first sentence is, this is an agreement between NAR and Zillow. The district court was entitled to adjudicate summary judgment based on the case that they brought, not now dealing with new theories that they're floating on appeal. When, in your view, does an optional rule cease to be optional? What kind of things would a court look to in making that assessment? Well, I mean, I think there are a lot of different ways in which an optional rule could de facto become, you know, mandatory. And again, I think it's not quite presented here, but you can look at the number of the percentages, the history of, you know, the proposal and the adoption. And there's a lot of cases like the NARAB case, you know, and others in which courts have wrestled with it. Just don't think that this is a case that tests upon whether or not this rule is optional. And the other thing I would note, NAR has multiple categories of rules. NAR has mandatory rules. NAR has recommended rules. And then NAR has optional rules. Optional rules is just like, we're putting this out there for our members, do what they want. We're not even recommending that they adopt it, much less a mandatory rule. So this is the lowest category of, you know, moral suasion or any kind of suasion, you know, that NAR does. But again, the rule wasn't optional for Zillow, right? When Zillow wanted the IDX feeds for particular MLSs, it had to sign up for the rule, and it would apply the rule in those jurisdictions. And so it doesn't seem to me that this is a case that tests any broad principle about when is an optional rule actually mandatory. Okay. I think we've exhausted our questions. Mr. Engel, thank you. Thank you, Your Honor. If I could just respond to a couple of points and then sum up. You just asked, when is an optional rule not optional? And then there was a discussion about the relationship of the MLSs to NAR. And again, it's our position that the MLSs are affiliates of NAR. The MLSs are a subset of NAR. NAR is comprised of members who compete, and they use their trade organization and the MLS to promulgate rules and deploy those rules to the MLSs. When is the rule not optional? It's not optional when the MLS adopts it, because at the point in time when the rule is adopted by the MLS, it becomes mandatory on the participants. Zillow became a participant because it wanted IDX feeds. Zillow clearly did not act. The record is just crystal clear that Zillow did not act independently here. Zillow's actions, Zillow redesigned its website directly in response to the segregation rule. But for the segregation rule, Zillow would not have fundamentally changed the way it had been doing business for 15 years. On the issue of optionality, I think that it is very important that I emphasize that the issue is concerted action. If only one MLS had adopted the rule, there would still be concerted action here. The scope of the conspiracy might be different, but there would still be concerted action. And I do wish to echo the government's concern in this case that if the trial court's order stands, it will serve as a blueprint for an incentivized trade associations like the National Association of Realtors to circumvent the antitrust laws by promulgating anti-competitive rules, labeling them as optional, and working through proxies. And that is, we believe, a compelling reason why this court should pay close attention to this case, closely examine the record. Again, our position is the scheme that we alleged here was segregation, not segregate, conceal, and demote. And we believe that the court should reverse. I do want to say one other thing in connection with the statements made by the government. We, of course, very much appreciate the government's position in this case. We don't think there is quite as clear a line between their theory two and theory three. We think that, again, the direct evidence here is the National Association of Realtors promulgated the rule, they deployed it to the MLSs, and Zillow agreed to adhere to the rule. And that is concerted action. That is a Section 1 agreement because the rule is anti-competitive on its face. I never had a chance to address the WCPA claim, but, of course, our position is that there was error there. And for that reason, also, there should be a . . . The case should be reversed, although on the WCPA claim we're asking just for a new trial on damages. Thank you. Thank you very much. I want to thank all counsel for their very helpful arguments in this case. This matter is submitted. That concludes our calendar for this morning. We'll stay adjourned until tomorrow. All rise.
judges: THOMAS, BRESS, ALBA